**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-22914-RAR**

**EDMUND GRIGORIAN**,

    Petitioner,

v.

**PAMELA JO BONDI**,
*U.S. Attorney General*, *et al.*,

    Respondents.
_____/

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

Immigration officials have "broad discretion" to enforce federal immigration law. *Arizona v. United States*, 567 U.S. 387, 396 (2012). But discretion is not a license to cut corners. When effectuating immigration policy, immigration officials must comply with the requirements of applicable regulations, statutes, and the Constitution. Because they failed to do so here, Petitioner demonstrates entitlement to a writ of habeas corpus. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Petitioner Edmund Grigorian's Petition for Writ of Habeas Corpus ("Petition"), [ECF No. 1], filed on June 27, 2025, is **GRANTED** as follows.

**BACKGROUND**

**I.   Factual Background**

Petitioner Edmund Grigorian ("Grigorian" or "Petitioner") is an Iranian national and a resident of the United States. Pet. ¶ 1. He fled to the United States in 1979 with his family following the Iranian Revolution due to "fear of future persecution based on religion, nationality, political opinion, and membership in a particular social group." *Id.* ¶ 18. Grigorian and his family are Armenian Christians, and Grigorian's father was "an avid supporter of the Shah of Iran" and a

member of the Rastakhiz, a monarchist group that opposes Iran's current political leadership. *Id.* ¶¶ 2, 18–19. As a result, Grigorian and his family suffered persecution in Iran. *Id.* ¶¶ 18–19.

Grigorian and his family were granted asylum in the United States on May 5, 1982. *Id.* ¶ 19. Based on his previously granted asylum, Grigorian became a Lawful Permanent Resident on September 13, 2002. *Id.* ¶ 20. In 2007, Grigorian was convicted on six counts of mail and wire fraud. *See* Judgment, *United States v. Grigorian*, Case No. 05-60203-CR (Jan. 8, 2007), ECF No. 325; *see also* Pet. ¶ 21. As a result, Grigorian was placed into removal proceedings pursuant to § 237(a)(2)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(A). *See* Pet. ¶ 21; Pet. Ex. B, [ECF No. 1-1]. Grigorian filed an application for withholding of removal under Article 3 of the Convention Against Torture ("CAT"), alleging that he would be subject to torture if he were deported to Iran. *Id.*

On July 18, 2011, an immigration judge issued an order finding that Grigorian is removable and ordering Grigorian removed from the United States to Iran ("Order of Removal"). *See* Pet. Ex. B, [ECF No. 1-1] at 30. Although the immigration judge denied Grigorian's application for withholding of removal, the immigration judge deferred removal to Iran under Article 3 of the CAT, finding that Grigorian would more likely than not be tortured if deported to Iran because he is Armenian, Christian, Americanized, and the son of a member of an Iranian opposition group. *See* Pet. ¶ 23, Pet. Ex. B, [ECF No. 1-1] at 29, 30. The Order of Removal did not identify any third country other than Iran to which Grigorian could be removed. Pet. ¶ 2. On a cover sheet to the Order of Removal, the immigration judge also "crossed out 'or in the alternative to' when indicating the country of removal is Iran and did not list any alternative third countries." Pet. ¶ 23; Pet. Ex. B, [ECF No. 1-1] at 7.

Grigorian appealed the Order of Removal to the Bureau of Immigration Appeals ("BIA"), which dismissed the appeal on October 21, 2011, finding that Petitioner is statutorily ineligible for

a waiver of inadmissibility, but leaving in place the deferral of removal. *See* Resp. Ex. A, [ECF No. 7-1]. The BIA decision rendered Grigorian's Order of Removal final. *See* 8 CFR § 1241.1(a) ("An order of removal made by the immigration judge shall become final . . . [u]pon dismissal of an appeal by the Board of Immigration Appeals[.]").

After the Order of Removal, United States Immigration and Customs Enforcement ("ICE") placed Grigorian on an Order of Supervision ("OSUP"), allowing him to remain free of ICE detention provided that he comply with the requirements of the OSUP, including by attending regularly scheduled appointments with ICE. *Id.* ¶ 24. There is no indication in the record that Grigorian at any time failed to comply with his OSUP.

ICE detained Grigorian on June 23, 2025, when he appeared at an ICE facility for one of his regularly scheduled appointments. *Id.* ¶¶ 25, 29. Grigorian met with an ICE Officer, who informed him that "ICE was revoking his OSUP and he was being taken into custody to affect his removal." Decl. of Rafael Utrera, [ECF No. 26-1] ¶ 8. ICE issued a Notice of Revocation of Release ("Notice") indicating that Grigorian was to "be kept in the custody of [ICE] . . . based on a review of [his] file and/or [his] personal interview," referencing the "[m]ost recent BIA decision in [his] case." *See* Notice, [ECF No. 7-2]. The Notice further stated that Grigorian would "promptly be afforded an informal interview at which [he] will be given an opportunity to respond to the reasons for the revocation" and, if he is not released following the informal interview, that he would "receive notification of a new review, which will occur within approximately three months of the date of this notice." *Id.* Grigorian is currently detained at the Krome North Service Processing Center in Miami-Dade County, Florida. Pet. ¶ 11.

## II. Procedural History

Grigorian filed this action on June 27, 2025, seeking (1) immediate release from detention; and (2) a TRO preventing Respondents from removing or transferring him outside the Court's

jurisdiction and requiring the Government "to provide [Petitioner] with notice and a hearing where he can confront and oppose removal to any alternative third country that agrees to accept him, if one is identified." Pet. at 14–15.  After briefing and a hearing, *see* [ECF Nos. 7, 8, 10, 13], the Court denied the TRO on July 8, 2025.  *See generally* Order Den. Mot. for TRO ("TRO Order"), [ECF No. 13].  The TRO Order required Respondents to show cause why the relief requested in the Petition, [ECF No. 1], should not be granted on or before July 30, 2025.  *See* [ECF No. 13] at 16.  Respondents filed a Response showing cause ("Response"), [ECF No. 18], on July 30, 2025, and Petitioner filed a Reply in support of the Petition ("Reply"), [ECF No. 21], on August 14, 2025.  The Court also required Respondents to clarify certain facts regarding the circumstances of Respondent's detention, which Respondents complied with on September 4, 2025.  *See* [ECF Nos. 25, 26].

## LEGAL STANDARD

Under 28 U.S.C. § 2241, federal district courts "within their respective jurisdictions" have the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States."  The "essence of habeas corpus is an attack by a person in custody upon the legality of that custody," and thus to be within the "core of habeas corpus," a petitioner must seek "either immediate release from that confinement or the shortening of its duration."  *Prieser v. Rodriguez*, 411 U.S. 475, 484, 489 (1973).  Section 2241 authorizes federal courts to hear challenges to immigration detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (noting that "28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear" challenges to the "lawfulness of immigration-related detention").

## ANALYSIS

### I. Subject Matter Jurisdiction

Respondents renew their argument that 8 U.S.C. § 1252(g) precludes review of Petitioner's

claims. *See* Resp. at 5–6. The Court concludes—as it did before—that it has jurisdiction over Grigorian's Petition. *See* TRO Order at 5–9 (explaining that § 1252(g) did not bar the Court's review of the Petition).

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). The Supreme Court has given § 1252(g) a "narrow reading," emphasizing that it does not cover "all claims arising from deportation proceedings" or impose "a general jurisdictional limitation." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482, 487 (1999) ("*AAADC*"); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020). Rather, as "the Supreme Court has explained, § 1252(g) lists just three 'discrete actions': actions to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1272 (11th Cir. 2021) (quoting *AAADC*, 525 U.S. at 482). "[A]lthough 'many other decisions or actions' may be 'part of the deportation process,' only claims that *arise from one of the covered actions* are excluded from [a court's] review (at least by this provision)." *Id.* (quoting *AAADC*, 525 U.S. at 482) (emphasis added).

The Supreme Court has likewise interpreted § 1252(g)'s "arise from" language narrowly, cautioning that § 1252(g) does not "sweep in any claim that can technically be said to 'arise from' the three listed actions"; instead, the statute "refer[s] to just those three specific actions themselves." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018). In other words, to determine whether a claim "arise[s] from" one of the covered actions, "courts must focus on the action being challenged," *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1258 (11th Cir. 2020), namely, whether one of the three actions listed in § 1252(g) forms the "basis

of the claim," *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) *suggestion for reh'g en banc denied*, 737 F.3d 694 (2013), *cert. denied*, 34 S.Ct. 2840 (2014).

Consequently, an alien who seeks a stay of a removal order or challenges the Attorney General's deportation authority "runs headlong into § 1252(g)" regardless of how the alien frames their claim because, at bottom, the action being challenged is the decision to "execute" a removal order. *Camarena*, 988 F.3d at 1273. The Eleventh Circuit has nevertheless distinguished between situations where an alien's claims are founded directly on a decision or action to commence proceedings, adjudicate cases, or execute removal orders, from those where an alien challenges the "underlying legal bases" of those decisions or actions. *Madu v. U.S. Atty. Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) (citations omitted); *accord Kong v. United States*, 62 F.4th 608, 617 (1st Cir. 2023) (finding that § 1252(g) does not bar "judicial consideration of collateral challenges to the legality of a petitioner's detention"); *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc) (finding that § 1252(g) does not bar consideration of "a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question—a description of the relevant law—forms the backdrop against which the Attorney General later will exercise discretionary authority"); *Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999) (finding that § 1252(g) did not bar review of a claim related to detention where the petitioner "did not ask the district court to block a decision 'to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter'").

Here, Grigorian does not challenge the decision to execute his removal, the decision to detain him, the methods by which he was detained, or the Government's authority to deport or detain him. Rather, the "basis of the claim" is that ICE did not "comply with the statutory requirements required to revoke an OSUP outlined in 8 C.F.R. § 241.4(l)(2)." Pet. ¶ 5. And Grigorian maintains that he "is not challenging the validity of the final order of removal, but rather

the legality of detention." [ECF No. 8] at 5.  Accordingly, the Petition does not challenge any *decision* or *action* to detain Grigorian in furtherance of the execution of his Removal Order—instead, it constitutes a challenge to the "underlying legal bases" of those decisions or actions. *Madu*, 470 F.3d at 1368 (citations omitted).  Reading § 1252(g) as foreclosing judicial review of such claims risks running afoul of the Supreme Court's admonition that § 1252(g) is not "a general jurisdictional limitation" on "all claims arising from deportation proceedings." *AAADC*, 525 U.S. at 482, 487.[1]  And, as the Supreme Court has made clear, § 2241 "confers jurisdiction upon the federal courts to hear" challenges to the "lawfulness of immigration-related detention." *Zadvydas*, 533 U.S. at 687

In sum, the Court does not believe that § 1252(g) bars review of this case to the extent Grigorian seeks only "substantive review of the underlying legal bases" for his detention.  *Madu*, 470 F.3d at 1368 (citations omitted).

**II.  Petitioner Does Not Show that ICE Lacked a Basis to Revoke His OSUP**

In the Petition and in the briefing on the TRO Motion, Grigorian argued that his detention was unlawful because under 8 C.F.R. § 241.4(l), ICE could revoke his OSUP "only if the individual violates conditions of release or if the conditions supporting release no longer exist." Pet. ¶ 31; *see also id.* ¶ 5 ("ICE violated [Petitioner's] due process in failing to comply with . . . 8 C.F.R. § 241.4(l)(2).  [Petitioner] has never violated the terms of his supervision, and the conditions supporting [Petitioner's] release on supervision have not changed.").  However, as the Court explained in denying the TRO, this argument is mistaken because § 241.4(l)(2) provides alternative bases for revocation other than violation of the conditions of release or changed

---

[1] The Court is unaware of—and Respondents do not provide—any in-circuit authority suggesting that § 1252(g) forecloses review of challenges to the underlying legality of detention.

circumstances. *See* TRO Order at 10–11. Specifically, § 241.4(l)(2) permits revocation "in the exercise of discretion when, in the opinion of the revoking official":

> (i) The purposes of release have been served;
>
> (ii) The alien violates any condition of release;
>
> (iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
>
> (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

§ 241.4(l)(2). Because Petitioner failed to explain why revocation of the OSUP failed to comply with these alternative bases for revocation, the Court found that Petitioner failed to demonstrate a substantial success of likelihood on the merits that the revocation was unlawful under § 241.4. TRO Order at 11.

Now, however, Petitioner argues that "revocation of release is controlled by 8 CFR § 241.13(i) and not 8 CFR § 241.4(l)(2)(i)-(iv)."[2] Reply at 2. The distinction is salient because § 241.13(i) restricts revocation more that § 241.4(l)(2). Whereas § 241.4(l)(2) permits revocation in the discretion of the revoking official when an alien falls into one of the four specific categories, § 241.13(i) permits revocation only if (1) the alien "violates any of the conditions of release," or (2) "on account of changed circumstances, [ICE] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* § 241.13(i)(1)–(2).

However, Petitioner does not demonstrate that the revocation was subject to § 241.13(i) and not § 241.4(l). Section 241.13 establishes a special review process for aliens otherwise subject to § 241.4 "where the alien has provided good reason to believe there is no significant likelihood

---

[2] Plaintiff did not previously argue that ICE unlawfully revoked his OSUP under § 241.13. Petitioner only mentioned § 241.13 once in passing in the Petition, and all of his substantive argument regarding revocation of the OSUP focused on § 241.4, not § 241.13. *See* Pet. ¶¶ 5, 31; TRO Reply at 4–5.

of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future." *Id.* § 241.13(a). In outline, the alien must first request a review of the likelihood of their removal under § 241.13. *See id.* § 241.13(c), (d). ICE then reviews the request according to the specific procedures and factors set out in the regulation. *See id.* § 241.13(e), (f). Upon completing the review, ICE "shall issue . . . a written decision based on the administrative record . . . regarding the likelihood of removal and whether there is a significant likelihood that the alien will be removed in the reasonably foreseeable future." *Id.* § 241.13(g). If ICE finds that the alien has demonstrated "no significant likelihood that the alien will be removed in the reasonably foreseeable future," ICE "shall" release the alien on an OSUP "[u]nless there are special circumstances justifying continued detention." *Id.* § 241.13(g)(1), (h).

Once released on an OSUP under § 241.13, ICE may only revoke the OSUP for the reasons specified in § 241.13(i). Revocation under § 241.13(i) applies only to aliens released under § 241.13(g)—where ICE has formally determined that there is no significant likelihood that the alien will be removed in the reasonably foreseeable future. *See id.* § 241.13(i)(1) (applying to "[a]ny alien who has been released under an order of supervision *under this section*") (emphasis added); *id.* § 241.13(i)(2) (providing that ICE "may revoke an alien's release *under this section*") (emphasis added).

Petitioner does not demonstrate that the revocation of his OSUP is governed by § 241.13(i) because there is no indication that ICE initially released him pursuant to § 241.13. Indeed, Plaintiff's own briefing indicates that "ICE lifted the immigration detainer and *pursuant to 8 CFR § 241.4* made the determination that he posed no danger to the public or risk of flight." Reply at 4 (emphasis added). The Notice of Revocation indicates that ICE revoked Petitioner's OSUP "pursuant to 8 CFR 241.4." [ECF No. 7-2] at 1. Nowhere does Petitioner indicate that he made a request for review under § 241.13 or that ICE made a written determination finding no significant

Page **9** of **20**

likelihood of removal in the reasonably foreseeable future. Where no such determination has been made, § 241.4 remains the default provision governing aliens detained or released after the removal period. *See* § 241.13(b)(1) ("Section 241.4 shall continue to govern the detention of aliens under a final order of removal . . . *unless* the Service makes a determination under [§ 241.13] that there is no significant likelihood of removal in the reasonably foreseeable future.") (emphasis added); *see also* § 241.4(b)(4) ("The custody review procedures in [§ 241.4] do not apply after [ICE] has made a determination, pursuant to the procedures provided in 8 CFR 241.13, that there is no significant likelihood that an alien under a final order of removal can be removed in the reasonably foreseeable future.").

Accordingly, the Court has no basis to find that Petitioner is subject to § 241.13 instead of § 241.4. The Notice of Revocation indicates that the reason for revocation was the "[m]ost recent BIA decision in [Petitioner's] case"—the Order that made Petitioner's Order of Removal final. [ECF No. 7-2] at 1. And § 241.4(l) permits revocation "in the exercise of discretion when, in the opinion of the revoking official . . . it is appropriate to enforce a removal order." 8 C.F.R. § 241.4(l)(2)(iii); *see also Tran v. Baker*, No. 1:25-CV-01598-JRR, 2025 WL 2085020, at *4 (D. Md. July 24, 2025), *corrected*, 2025 WL 2087124 (D. Md. July 24, 2025) (noting that § 251.4(l)(2) "permits the Government extraordinarily broad discretion to revoke an OSUP"). Petitioner makes no attempt to explain why revocation of his OSUP failed to comply with § 241.4(l) beyond the bare assertion that "[n]one of the four (4) reasons apply." Reply at 5. Accordingly, Petitioner fails to demonstrate that the revocation of his OSUP was not authorized.

### III. ICE Failed to Provide Petitioner with an Informal Interview in Violation of Its Own Regulations and the Due Process Clause

Although Petitioner's OSUP was subject to § 241.4(l) and not § 241.13(i), the Court nevertheless finds that ICE failed to provide Petitioner with a meaningful opportunity to contest

the revocation of his OSUP through an informal interview. This violates both ICE's own regulations and the Due Process Clause of the Fifth Amendment.

Upon revocation of an OSUP under § 241.4(l), an alien must be "notified of the reasons for revocation." 8 C.F.R. § 241.4(l)(1). "[A]fter his or her return to [ICE] custody" the alien must be "afforded an initial informal interview promptly to afford the alien an opportunity to respond to the reasons for revocation stated in the notification."[3]  *Id.* "If the alien is not released from custody following the informal interview," ICE must then commence "[t]he normal review process . . . with notification to the alien of a records review and scheduling of an interview, which will ordinarily be expected to occur within approximately three months after release is revoked." *Id.* § 241.4(l)(3).

The notice and informal interview requirement appears in § 241.4(1)(1), but not § 241.1(l)(2). However, courts have "interpreted section 241.4(l) as requiring an informal interview upon the revocation of release regardless of the reason for the revocation"—meaning that the notice and informal interview requirement stated in § 241.4(1)(1) applies to revocation under § 241.4(1)(2). *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 163 (W.D.N.Y. 2025) (collecting cases); *see also Noem v. Abrego Garcia*, 604 U.S. ——, 145 S. Ct. 1017, 1019 (2025) (Sotomayor, J., statement respecting the Court's disposition of the application) (stating that under 8 C.F.R. § 241.4(l), "in order to revoke conditional release the Government must provide adequate notice and 'promptly' arrange an 'initial informal interview . . . to afford the alien an opportunity to respond to the reasons for the revocation stated in the notification'"); *Zhu v. Genalo*, No. 1:25-CV-06523 (JLR), 2025 WL 2452352, at *6 (S.D.N.Y. Aug. 26, 2025) ("[P]aragraph (*l*) sets forth

---

[3] Section 241.13 likewise provides that "[u]pon revocation, the alien will be notified of the reasons for revocation of his or her release" and will receive "an initial informal interview promptly after his or her return to [ICE] custody." 8 C.F.R. § 241.13(i)(3).

a unified set of procedures for the revocation of removal."); *but see Barrios v. Ripa*, No. 1:25-CV-22644, 2025 WL 2280485, at *6 (S.D. Fla. Aug. 8, 2025) (finding that "it does not appear that Petitioner was entitled notice or an informal interview" because Petitioner's OSUP was revoked pursuant to § 241.4(l)(2), not § 241.4(l)(1)).

As a matter of text, the Court is persuaded that the notice and interview requirement stated in § 241.4(l)(1) applies to revocation under § 241.4(l)(2). The four reasons for revocation stated in § 241.4(l)(2) are inclusive of the single reason stated in § 241.4(l)(1)—violation of conditions of release. "This overlap belies the . . . argument that these are two separate processes, and suggests that paragraph (l) sets forth a unified set of procedures for the revocation of removal." *Zhu*, 2025 WL 2452352, at *6. Indeed, it would be nonsensical if an alien detained for violation of conditions of release would receive notice and an interview under § 241.4(l)(1) but not § 241.4(l)(2) given that both provisions specify that a violation of conditions of release is a basis for revoking an OSUP.

Second, and even more tellingly, § 241.4(3)—titled "[t]iming of review when release is revoked"—clearly applies to all aliens whose release is revoked regardless of reason, and provides that "[i]f the alien is not released from custody *following the informal interview provided for in paragraph (l)(1)* of this section, [ICE] shall schedule the review process in the case of an alien whose previous release" has been revoked. *Id.* § 241.4(3). This provision implies "that 'the informal interview provided for in paragraph (l)(1) of this section' applies to all [detained on revocation of an OSUP] regardless of whether or not release is revoked for a violation."[4] *Ceesay*, 781 F. Supp. 3d at 164.

---

[4] Moreover, in enacting § 241.4, the Government indicated that the notice and interview requirement provided in § 241.4(l)(1) would apply "upon revocation" to those detained pursuant to § 241.4(l)(2). *See Detention of Aliens Ordered Removed*, 85 Fed Reg. 80281, 80290 (Dec 21, 2000) ("[R]evocation or withdrawal of release . . . may be appropriate for any of the reasons listed in section 241.4(l)(2) of the

In any event, Respondents do not contest that the procedural requirements set out in § 241.4(l)(1) apply to the revocation of Petitioner's OSUP under § 241.4(l)(2). Indeed, they have repeatedly represented to the Court that the notice and interview requirements *do* apply,[5] as the Court noted in the TRO Order. *See* TRO Order at 10 ("As the Government has represented in its briefing and at the Hearing, Grigorian will be promptly afforded the informal opportunity to contest the basis for his detention and, if he is not released, will be given a formal review of his case."). Similarly, the Notice issued on June 23, 2025 also clearly states that, "pursuant to 8 CFR 241.4," Petitioner "will promptly be afforded an informal interview" at which he "will be given an opportunity to respond to the reasons for the revocation." Notice at 1.

Petitioner, however, indicates that he "never had an informal interview." Reply at 5. Because the record did not reflect that Respondents had ever provided Petitioner with the required informal interview, on September 3, 2025, the Court issued an Order Requiring Clarification, requiring Respondents to inform the Court "whether Petitioner has received an informal interview and, if so, on what date." [ECF No. 25]. On September 4, 2025, Respondents filed a Notice of Clarification, [ECF No. 26], accompanied by a Declaration of Deportation Officer Rafael Utrera ("Declaration"), [ECF No. 26-1]. According to Respondents, Petitioner received an informal interview on June 23, 2025, *before* he was taken into ICE custody. [ECF No. 26] at 2. Per the

---

rule, including the alien's violation of a condition of release. Section 241.4(l)(1) of the rule provides that, upon revocation, the alien will be provided notice of the reasons for the revocation . . . [and] the alien will be afforded an initial informal interview promptly after his return to [ICE] custody to provide the alien an opportunity to respond to the reasons for the revocation.").

[5] *See, e.g.*, July 3, 2025 Hr'g Tr., [ECF No. 14] at 7:9–20 (counsel for Respondents stating that, "what I can assure you is what's been assured to me, that the agency will first provide notice, and then he'll have both initially an informal means of contesting it on the basis that he has a fear that his removal to that third country would subject him to torture or prosecution. If informally within the agency they don't agree that he's made such a showing, then he has the opportunity to have that determination reviewed by an immigration judge. This is what I've been told will happen in the case, and I have no reason to doubt that that's what would happen in this case.").

Declaration, Officer Utrera met with Petitioner when Petitioner reported to the ICE ERO field office in Miramar, Florida on June 23, 2025, for his regularly scheduled reporting in compliance with his OSUP. Decl. ¶ 8. At the meeting, Utrera "explained that ICE was revoking his OSUP and he was being taken into custody to affect [sic] his removal." *Id.* After this explanation, Utrera "provided Petitioner with a copy of the Notice of Revocation of Release." *Id.* ¶ 9.[6] As Utrera recalls it, "Petitioner did not ask any questions." *Id.* ¶ 10. Petitioner and Utrera then "had a conversation regarding his prior detention, his employment, and recent news coverage regarding Iran." *Id.* ¶ 11. Petitioner then made phone calls to his mother, his employer, and his attorney, during which Officer Utrera also spoke with Petitioner's attorney, although Utrera does not report the contents of that discussion. *Id.* ¶ 13. Afterwards, "Petitioner was taken into ICE custody." *Id.* ¶ 14. Respondents characterize Petitioner's meeting with Utrera as an "informal interview" and therefore, "Petitioner's informal interview had already taken place" when he was provided with the Notice. [ECF No. 26] at 2.

But Petitioner's conversation with Officer Utrera does not comply with what § 241.4(l) requires of an informal interview. Under ICE's regulations, the informal interview must occur "*after* [the alien's] return to [ICE] custody" and "afford the alien an *opportunity to respond* to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(l)(1) (emphasis added). Only "if the alien is *not released* from custody *following* the informal interview" will ICE "schedule the review process" for an alien "whose previous release . . . has been . . . revoked." *Id.* § 241.4(l)(1) (emphasis added).

---

[6] Officer Utrera avers that "[t]here is a scrivener's error in the certificate of service attached to the Notice insofar as the Notice was served on June 23, 2025, when I interviewed Petitioner, not June 18, 2025." [ECF No. 26-1] ¶ 9 n.1.

The conversation with Officer Utrera plainly cannot be the informal interview contemplated by § 241.4(l) because it occurred *before* he was presented with the Notice and *before* he was taken into custody. This fails to comply with § 241.4(l), which requires the informal interview to occur *after* the alien is presented with the notice and *after* the alien has been taken into custody.

More fundamentally, this sequencing also fails to provide "an *opportunity to respond* to the reasons for revocation stated in the notification." *Id.* § 241.4(l)(1) (emphasis added). Petitioner came into the ICE facility for a routine check-in pursuant to his OSUP, as he had been doing for the previous twelve years. Officer Utrera then met with Petitioner and informed him that ICE was revoking his OSUP. Decl. ¶ 8. At this point, there was no indication available to either Petitioner or any reasonable observer that the meeting was actually an opportunity to contest his pending detention. It was only after this interaction—which Respondents characterize as the informal interview—that Petitioner was provided with the Notice, which stated that Petitioner "*will* promptly be afforded an informal interview at which [he] *will* be given an opportunity to respond to the revocation." Notice at 1 (emphasis added).

Petitioner would therefore have had no reason to believe that the conversation with Utrera was the "informal interview" specified in the Notice. After Petitioner received the Notice, he and Utrera had a conversation regarding his prior detention, his employment, and recent news coverage regarding Iran. Decl. ¶ 11. Absent from this "conversation" was any discussion of the reasons for revocation. Again, there was no reason to believe that this conversation was an opportunity for Petitioner to contest his detention because the Notice provided that "if you are not *released after* the informal interview, you will receive notification of a new review, which will occur within approximately three months[.]" Notice at 1 (emphasis added). But at this point, Grigorian was not yet in custody—so he could not have suspected that this "conversation" was the informal

interview at which he could plead his case to be released from custody. Unsurprising given these circumstances, "Petitioner did not ask any questions" of Utrera, Decl. ¶ 11, further underscoring that he did not believe (nor should he have) that this interaction was in fact an opportunity to contest the revocation of his OSUP.

Respondents' characterization of this interaction with Officer Utrera as the informal interview is also somewhat puzzling in light of the course of litigation. Not once during this litigation did Respondents describe Petitioner's initial encounter with ICE on June 23, 2025, as an "informal interview" under § 241.4(l) prior to the Notice of Clarification. During the litigation over Petitioner's TRO Motion (which occurred over the first fifteen days of his detention), Respondents consistently referred to the "initial interview" as something that "*will*" occur in the future, not something that happened in the past. *See* [ECF No. 7] at 5 (representing that Respondents are "providing Grigorian 'an initial informal interview' at which he *will* have 'an opportunity to respond to the reasons for revocation stated in the notification.'" (quoting 8 C.F.R. § 241.4(l)(3)) (emphasis added)); July 3, 2025 Hr'g Tr., [ECF No. 14] at 7:9–14 (counsel for Respondents stating that, "what I can assure you is what's been assured to me, that . . . he'll have both initially an informal means of contesting it on the basis that he has a fear that his removal to that third country would subject him to torture or prosecution.").

And in direct response to the Petition, as recently as July 30, 2025—over a month into Petitioner's detention—Respondents again indicated that Petitioner *will* receive an informal interview. Response at 7 (reiterating Respondent's previous representation that they are "providing Grigorian 'an initial informal interview' at which he *will* have 'an opportunity to respond to the reasons for revocation stated in the notification.'" (quoting 8 C.F.R. § 241.4(l)(3)) (emphasis added))). These representations belie Respondents' contention that the conversation Petitioner had when he came in for his OSUP check-in was in fact the informal interview required

by 241.4(l)—a position Respondents took only after the Court required them to indicate whether they had given Petitioner an informal interview.

The process afforded here fails to comply with ICE's own regulations or comport with traditional notions of due process. It is a rather "unremarkable proposition that an agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979) (discussing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)); *see also Romano-Murphy v. Comm'r*, 816 F.3d 707, 720 (11th Cir. 2016) (noting that "executive agencies must comply with the procedural requirements imposed by statute," and "must respect their own procedural rules and regulations") (quoting *Gonzalez v. Reno*, 212 F.3d 1338, 1349 (11th Cir. 2000))). Of course, not every agency misstep will compel reversal of agency action, much less release of someone in custody. *See, e.g.*, *Sharma v. Drug Enf't Agency*, 511 F. App'x 898, 902 (11th Cir. 2013) (noting that an agency's violation of its own regulations will not necessarily be a due process violation if the claimant's rights were not prejudiced or if there is an adequate post-deprivation remedy available to cure the violation). Courts, however, are not so forgiving when the violation "implicates basic due process rights." *Cf. Alabama Hosp. Ass'n v. Beasley*, 702 F.2d 955, 958 n. 6 (11th Cir. 1983); *Republic Nat'l Bank of Dallas v. Crippen,* 224 F.2d 565, 566 (5th Cir. 1955) (holding that the denial of the right to be heard "is a violation of due process which can never be harmless error").

The opportunity to contest detention through an informal interview is not some ticky-tacky procedural requirement; it strikes at the heart of what due process demands. *See Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) ("At one level, today's dispute may seem semantic, focused on a single word, a small one at that. But words are how the law constrains power."). The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. "Freedom from imprisonment—

from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.  In its most elemental formulation, "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Sharma*, 511 F. App'x at 901 ("The essence of due process is an opportunity to be heard at a meaningful time and in a meaningful way." (citing *Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir. 2009))).

Here, Petitioner has been in custody for over seventy-five days without ever having received a meaningful opportunity to be heard or to contest the basis for his re-detention. Petitioner's initial encounter with Officer Utrera on June 23, 2025, was not a meaningful opportunity to be heard—regardless of whether it is framed as an "informal interview."  The Notice—the only indication that he could contest his detention—indicated that he would receive an opportunity to be heard *after* he was already in custody.  Petitioner would have had no inkling that his conversation with Officer Utrera would be his sole shot to contest the deprivation of his liberty until the formal review process promised approximately three months later.  Nor does the faint promise of an opportunity to be heard three months down the line satisfy what due process requires.  *See* 8 C.F.R. § 241.4(l)(3) (providing that the formal review process will begin "within approximately three months" only "*if* the alien is not released from custody *following the informal interview*").  If the eventual promise of a formal review were enough to cure a due process violation, ICE would be able to hold individuals for approximately three months after revocation with *no* meaningful opportunity to be heard.

The failure to provide Petitioner with an informal interview promptly after his detention or to otherwise provide a meaningful opportunity to contest the reasons for revocation violates both ICE's own regulations and the Fifth Amendment Due Process Clause.  This compels Petitioner's

release.  Courts around the country have concluded likewise.  *See, e.g.*, *Ceesay*, 781 F. Supp. 3d at 166; *You v. Nielsen*, 321 F. Supp. 3d 451, 463 (S.D.N.Y. 2018); *Rombot v. Souza*, 296 F. Supp. 3d 383, 387 (D. Mass. 2017); *Zhu*, 2025 WL 2452352, at *7–9;  M.S.L. v. Bostock, No. 6:25-CV-01204-AA, 2025 WL 2430267, at *10–12 (D. Or. Aug. 21, 2025); *Escalante v. Noem*, No. 9:25-CV-00182-MJT, 2025 WL 2491782, at *3 (E.D. Tex. July 18, 2025); *Hoac v. Becerra*, No. 2:25-cv-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025); *Wing Nuen Liu v. Carter*, Case No. 25-cv-03036-JWL, 2025 WL 1696526, at *2 (D. Kan. June 17, 2025); *M.Q. v. United States*, 2025 WL 965810, at *3, *5 n.1 (S.D.N.Y. Mar. 31, 2025).

To be clear, the Court is not "reviewing and reversing the manner in which discretion was exercised." *Accardi*, 347 U.S. at 268.  As the Court has already explained, the Government may revoke Petitioner's OSUP for any of the reasons stated in § 241.4(l)(2).  But they may not detain him without offering a meaningful opportunity to contest those reasons.  After all, "if men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez*, 593 U.S. at 172.  The Court therefore finds that Petitioner must be released from custody.[7]

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Petitioner's Petition for Writ of Habeas Corpus, [ECF No. 1], is **GRANTED**.

2. Respondents are **ORDERED** to release Petitioner from custody to a public place on or before **September 10, 2025**, pursuant to the terms of his prior Order of Supervision.

3. Respondents shall certify compliance with this Order on or before **September 11, 2025**.

---

[7] Because the Court finds that Petitioner must be released, it need not consider Petitioner's argument that his detention beyond the removal period violates the Due Process Clause.  *See* Reply at 8–9.

4. The Clerk shall **CLOSE** this case.

5. The Court retains jurisdiction to enforce this Order.

**DONE AND ORDERED** in Miami, Florida, this 9th day of September, 2025.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**